UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

PAUL SANDERS, B27632,

        Plaintiff,

v.         Case No. 1:07-1100-HAB-JAG

WEXFORD HEALTH SOURCES, INC.,
and SYLVIA MAHONE, MD.
        Defendants.

MEMORANDUM OPINION AND ORDER

INTRODUCTION

    Before the court are the defendants', Wexford Health Sources, Inc. and Dr. Mahone, motion for summary judgment [33], the plaintiff's response [37], and the defendants' response [38] respectively. The plaintiff Paul Sanders, *pro se,* has submitted a complaint under 42 U.S.C. § 1983 against defendants, Wexford Health Sources, Inc. and Dr. Sylvia Mahone. The plaintiff alleges defendants' deliberate indifference to the plaintiff's serious medical needs. The plaintiff alleges defendants violated his rights under the Eighth Amendments to the United States Constitution by deliberate indifference to his serious medical needs.

    The defendants, Wexford Health Sources, Inc. and Dr. Mahone, by their attorney Theresa Powell, have moved the court for an order granting summary judgment in favor of the defendants because the plaintiff has allegedly failed to refute the undisputed statements of fact contained in defendants' motion for summary judgment.

MOTION FOR SUMMARY JUDGMENT STANDARD

    Summary judgment is proper if the pleadings, answers to interrogatories, depositions, and admissions, along with affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In determining whether there are any genuine issues of material fact, the court must draw all inferences in the light most favorable to the non-movant. *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir.1986). Yet not every conceivable inference must be drawn, only reasonable inferences. *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 312-13 (7th Cir.1986).

The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden by "showing . . . an absence of evidence to support the nonmoving party's case." *Id.*, 477 U.S. at 325. When the moving party has met the burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250. In determining whether the non- movant has identified a "material" issue of fact for trial, "[o]nly dispute[s] that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 298 (7th Cir. 1996). A court must enter summary judgment against the plaintiff when the plaintiff fails to come forward with evidence that would reasonably permit a finder of fact to find in the plaintiff's favor on a material question. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

## ALLEGATIONS

Plaintiff, Paul Sanders, an inmate at Pontiac Correctional Center has chronic right shoulder instability which limits the plaintiff's right arm to having only 20- 25 degrees of mobility. As a result of this instability, plaintiff suffers from chronic shoulder dislocations in his right shoulder. Medical images of the right shoulder reveal that plaintiff's right shoulder contains a broken screw, from a previous surgery, as well as spurs in the articular surface of the humeral head of the plaintiff's shoulder area, due to degenerative arthritis. Plaintiff Sanders argues that he visited the Pontiac Correctional Center HCU between March 2005 and August of 2008 and was denied medical treatment for his conditions. The plaintiff alleges a violation of his rights under the Eighth Amendment to the US Constitution by the defendants' deliberate indifference to his serious medical needs.

## FACTS[1]

The following facts are undisputed material facts:

1.  The plaintiff Paul Sanders has been incarcerated at the Pontiac Correctional Center since 2005 and was therefore incarcerated at the time he filed this lawsuit. (Pl.'s deposition, p.3, 13-18.)

2.  After reviewing Sander's medical records, Dr. Sylvia Mahone determined that the plaintiff came to the Pontiac Correctional Center in March 2005. (Def. Exh. A and A-1.)

---

[1] The facts for this case may be found at docket entry number [33], with the exception of fact 6 which may be found at both docket entry [33] and [37].

3.     On that date, Sander's had a documented history of a dislocated shoulder with multiple treatments, including attempted surgical procedures. (Def. Exh. A and A-1.)

4.     Dr. Sylvia Mahone has been employed by Wexford Health Sources, Inc. as the Medical Director at the Pontiac Correctional Center since July 24, 2006. (Def. Exh. A, l. 2.)

5.     Before Dr. Mahone became the Medical Director at the Pontiac Correctional Center, other physicians treated Sanders for his shoulder dislocation on numerous occasions. (Pl.'s Ehx. A)

6.     Before Dr. Mahone arrived at the Pontiac Correctional Center, it appears that Sanders had been seen by Dr. Goldberg on May 8, 2006 at the University of Illinois at Chicago in the radiology department. A CT was taken of the right upper extremity. (Def.'s Exh. A and Group Exh. A-16 and Pl.'s Exh. B.)

7.     Shortly after Dr. Mahone's arrival at the Pontiac Correctional Center, she reviewed the medical records of Mr. Sanders concerning his complaints of shoulder dislocation problems. (Def.'s Exh. A and A-2.)

8.     Dr. Mahone discussed the case with Dr. Funk, one of the physicians who had previously seen Mr. Sanders at the Pontiac Correctional Center. Dr. Funk is now serving as the Regional Medical Director for Wexford Health Sources, Inc. (Def.'s Exh. A and A-2.)

9.     At that time, Dr. Funk approved a follow-up visit at the University of Illinois at Chicago for Sanders to be seen by an orthopedic specialist. (Def.'s Exh. A and A-2.)

10.    Dr. Mahone saw Sanders on July 28, 2006. (Def.'s Exh. A and A-2.)

11.    Dr. Mahone had only been serving as the Medical Director at the Pontiac Correctional Center for three days when she was made aware of Sanders' complaints of shoulder problems. He was immediately scheduled for a follow-up visit at the University of Illinois at Chicago to be seen by their orthopedic staff to evaluate his shoulder instability, which was well documented in his medical records. (Def.'s Exh. A and A-2.)

12.    In reviewing the records in the file, Dr. Mahone was aware that Sanders had made numerous complaints of shoulder dislocation and had been treated by physicians, both inside the correctional facility as well as outside the correctional facility, without much success in preventing future dislocations. (Def.'s Exh. A.)

13.    Mr. Sanders received surgery on March 22, 2005 at St. Mary's Hospital in
          Streator,
Illinois. Specifically, under anesthesia his dislocated shoulder was reduced. (Def.'s Exh. A and Def.'s Grp. Exh. A-3.)

14.     A visit to the orthopedic group at the University of Illinois at Chicago was scheduled for August 2008.  (Def.'s Exh. A)

15.     On August 28, 2006, Mr. Sanders was taken to the University of Illinois at Chicago medical center for consultation.  He was returned on the same date.  The medical note from that date written by the nurse states "Dr feels unable to correct with surgery."  (Def.'s Exh. A-4)

16.     Mr. Sanders was seen on August 28, 2006 by attending physician Benjamin A. Goldberg and most likely one of his residents, Dr. Finlayson.  (Def.'s Exh. A and Def.'s Grp. Exh. A-5.)[2]

17.     Dr. Mahone reviewed this medical record from Dr. Goldberg, which indicates that Dr. Goldberg confirmed the patient had right shoulder instability.  His plan indicates that Mr. Sanders' symptoms appeared to him to be voluntary in origin.  Dr. Goldberg's record reflects, as well, that in his opinion further stabilization procedures would be unlikely to help Mr. Sanders due to the voluntary component of his symptomatology.  Dr. Goldberg advised Mr. Sanders of his opinions and documented in his record that fusion was unlikely to help the patient as it would not relieve that patient's pain.  Dr. Goldberg's note also confirms in writing to Dr. Mahone that no further follow-up was indicated for Mr. Sanders with the orthopedic surgeons.  The patient was thereafter referred back to the Pontiac Correctional facility for management.  (Def.'s Exh. A and Def.'s Grp. Exh. A-5.)

18.     Based upon Dr. Goldberg's assessment, Mr. Sanders was followed up for treatment of his symptoms as no surgical intervention was deemed necessary.  (Def.'s Exh. A.)

19.     Mr. Sanders continued to make complaints of shoulder dislocation and shoulder pain.  He was treated by other physicians and nursing staff at the Pontiac Correctional facility.  (Def.'s Exh. A and Def.'s Grp. Exh. A-6.)

20.     Dr. Mahone next saw Mr. Sanders on December 20, 2006.  Her note from that date reads as follows:

> S (subjective): 1) complains of pain right shoulder.  Cannot get shoulder back in even though he has tried; 2) also complains of upper left testicle.
>
> O (objective): Vital signs as above.  Patient appears comfortable NAD (no acute distress)/cooperative.  Right shoulder displaced.  Posterior-tight spasm.  Attempted to reduce dislocation right shoulder 3 times without success.

---

[2]The plaintiff disputes this fact by merely stating that Def.'s Exh. A-5 totally contradicts with Def.'s Exh. A-6, without asserting how they are contradictory.

A (assessment):  Dislocated right shoulder/spasm apparent.

P (plan):  1) Motrin 800 mg by mouth twice per day for 3 months; 2) Robaxin 750 mg orally twice per day for 3 months; 3) Zantac 300 mg orally every day for 3 months; 4) case discussed with Dr. Larson; 5) ultrasound of testicle, attention to left.
(Def.'s Exh. A and Def.'s Exh. A-7.)

21.    Dr. Mahone saw Mr. Sanders again on December 21, 2006. (Def.'s Exh. A and Def.'s Exh. A-8.)  Dr. Mahone's note from that date reads as follows:

S (subjective):  Patient here with complaints of right shoulder being out.  Long discussion with patient, who finally consents to stay in infirmary overnight after injection.  States he normally responds to Demerol/Vistaril.

O (objective):  Vital signs as above. Patient and alert and oriented X 3/NAD (no acute distress).  Right shoulder displaced.

A (assessment):  Right shoulder dislocation.

P (plan):  Weight: 212.  1) house in infirmary for now; 2) vital signs every 4 hours X 2, then every shift X 2; 3) Demerol 75 mg + 50 Vistaril IM (intramuscular) now; 4) please check IM every 4 hours to see if shoulder reduced; 5) Ativan 2 mg IM given X 2. (Def.'s Exh. A and Def.'s Exh. A-8.)

22.    Based on Dr. Mahone's assessment of Mr. Sanders, his shoulder continued to be dislocated and she placed him in the infirmary for observation and for additional treatment. (Def.'s Exh. A.)

23.    By the next morning, Mr. Sanders' shoulder was back in and he wanted to go back to his cell house.  (Def.'s Exh. A and Def.'s Exh. A-9.)

24.    At 9:00 a.m. Dr. Mahone advised the nurse that Mr. Sanders could return to his cell
house.  (Def.'s Exh. A and Def.'s Exh. A-9.)

25.    Even after Plaintiff was discharged from the infirmary, the medications that Dr. Mahone prescribed were continued to be given to him per her previous order.  These medications were prescribed to help Mr. Sanders with his pain and muscle spasms.  (Def.'s Exh. A.)

26.    Dr. Mahone saw Mr. Sanders again on January 15, 2007.  Her note from that date reads as follows:
S (subjective):  "My shoulder is still out.  It is in a lot of spasm."  Ate yesterday.

O (objective):  Patient alert and oriented X 3/no acute distress.  Patient answers

appropriately.

A (assessment):  1) right shoulder dislocation; 2) no longer on hunger strike.

P (plan):  1) Ativan 2 mg intramuscular now; 2) Robaxin 750 mg 2 tablets orally now. (Def.'s Exh. A and Def.'s Exh. A-10.)

27. Again, Mr. Sanders presented to Dr. Mahone with complaints of his shoulder being dislocated.  She prescribed muscle relaxants and pain relievers to him to assist in reducing his dislocated shoulder.  She had previously consulted with an orthopedic surgeon regarding Mr. Sanders' condition, so she felt there was no reason to refer him to an outside physician for further evaluation.  (Def.'s Exh. A.)

28. Given that Mr. Sanders had a voluntary component to his problem, there was nothing that could be done to completely prevent his shoulder from becoming dislocated.  In March 2005, Dr. Sinha indicated in plaintiff's medical records that a posterior bone block was an option.  (Def.'s Exh. A. and Def's Exh. A-3.)

29. Dr. Mahone's next entry in Mr. Sanders' medical records is dated April 19, 2007. On that date, she reviewed his chart and renewed his low bunk permit for one year through April 19, 2008.  (Def.'s Exh. A and Def.'s Exh. A-11.)

30. Dr. Mahone next saw Mr. Sanders on August 6, 2007.  (Def.'s Exh. A and Def.'s Exh. A-12.)

31. It should be noted that between the dates of Dr. Mahone's visits with Mr. Sanders, he was seen by other medical personnel, including CMTs, nurses, as well as other on-staff physicians at the Pontiac Correctional Center.  (Def.'s Exh. A.)

32. On August 6, 2007, Dr. Mahone saw Mr. Sanders in the Medical Director clinic.  Her note from that date reads as follows:
S (subjective):  Lost previous right shoulder harness– "They took it. I had 4 surgeries on right shoulder."  Shoulder comes out 3 to 4 times per month. Wants ortho referral.

O (objective):  Waist 42"; Chest 42".  Vital signs as above.  Patient alert and oriented X 3/NAD (no acute distress)/cooperative.  Right shoulder– patient does click it out and puts it back on own.

A (assessment):  Right shoulder disfunction [sic].

P (plan):  1) chart review; 2) right shoulder harness permit for 1 years 8/6/07 to 8/6/08; 3) extra pillow for one year 8/6/07 to 8/6/08; 4) other permits good until

January 2008 – low bunk and cuffing permit. (Def.'s Exh. A and Def.'s Exh. A-12.)

33. Mr. Sanders was seen again for his complaints of right shoulder problems. Dr. Mahone renewed his permits for an extra pillow, as well as permits for a low bunk and special cuffing procedures. In addition, she gave him a right shoulder harness permit. (Def.'s Exh. A.)

34. Although Mr. Sanders requested an orthopedic referral, there was no need for such a referral in Dr. Mahone's medical opinion. Mr. Sanders had already been evaluated by an orthopedic surgeon, who advised that no surgery would be beneficial to Mr. Sanders. Accordingly, as Mr. Sanders' complaints and problems had not changed since his last referral to the orthopedic surgeon, there was no medical reason to send him out again. (Def.'s Exh. A.)

35. Dr. Mahone saw Mr. Sanders again on October 3, 2007. Her note from that date reads as follows:
S (subjective): "My right shoulder keeps going out – it is easy to go out and put in."
2) Ibuprofen not really helping - wants shoulder immobilizer.

O (objective): Vital signs afebrile (no fever). Patient alert and oriented X 3/no acute distress/cooperative. Right shoulder currently in place.

A (assessment): Right shoulder disfunction.
P (plan): 1) Discontinue ibuprofen; 2) Naproxen 500 mg orally twice a day for 2
months; 3) consider basket wrap girdle; 4) return to call in 1 month. (Def.'s Exh. A and Def.'s Exh. A-13.)

36. Dr. Mahone saw Mr. Sanders on October 3, 2007 for continued complaints of problems relating to his shoulder. At that time, he specifically advised Dr. Mahone that his shoulder would go out, but was easy to put back in. He told her that ibuprofen wasn't helping him, so she discontinued that and ordered Naproxen to see if this would help with his complaints of pain. Dr. Mahone also ordered a different type of wrap for his shoulder and advised the patient to return in a month. (Def.'s Exh. A.)[3]

37. Mr. Sanders returned to the healthcare unit on October 24, 2007 for an X-ray, at which time he refused to have the X-ray taken. (Def.'s Exh. A and Def.'s Exh. A-14.)

38. On the same date, Nurse Friel noted that Mr. Sanders came to the healthcare unit for an X-ray, stating his shoulder was to be put back in place before the X-ray was taken. He was advised to put the shoulder back in himself as he had done in the past. He was offered Robaxin, a muscle relaxant, but he refused this, saying he was being denied medical treatment. (Def.'s Exh. A and Def.'s Exh. A-15.)

---

[3]Plaintiff denies this fact, but does not support with an affidavit.

39. Mr. Sanders was seen on the loading dock carrying a heavy bag of wet mop heads to the laundry room with his right arm. After dropping off the bag, he walked over to the loading door hydraulic lift and shoved it closed without any problems. A CMT commented to him regarding his shoulder. This information was reported to Dr. Mahone by the CMT and

documented in Plaintiff's medical record on April 11, 2008. (Def.'s Exh. A and Def.'s Exh. A-18.)[4]

40. On June 16, 2008, Dr. Mahone reviewed Mr. Sanders' requests for updated permits. She noted that Mr. Sanders was housed in the special protective custody unit and therefore cuffing permits were not necessary, to her understanding. She wrote a low bunk permit for Mr. Sanders for one year from June 16, 2008 through June 16, 2009. (Def.'s Exh. A and Def.'s Exh. A-19.)

41. On August 19, 2008, Dr. Mahone was advised that Mr. Sanders wrote a grievance regarding his permits. She reviewed his chart and noted he was living in protective custody and therefore should not need a cuffing permit. However, she did extend his extra pillow and right shoulder harness permits through August of 2009. (Def.'s Exh. A and Def.'s Exh. A-20.)

42. Dr. Mahone next saw Mr. Sanders on October 23, 2008. (Def.'s Exh. A. and Def.'s Grp. Exh. A-21.) Her note from this visit reads as follows:

> S (subjective): 1) No stomach pain while taking ibuprofen. Ibuprofen works better than Ultram because I can take as needed; 2) I really need a cuff permit because you are cuffed during shake-downs.
>
> O (objective): Right should with apparent dislocation. Verified by X-ray after administration of Demerol (10 to 15 minutes later). Gentle traction applied to right shoulder - reduction of shoulder joint.
>
> A (assessment): Successful right shoulder reduction.
>
> P (plan): 1) Discontinue Ultram; 2) Ibuprofen 800 mg orally 3 times a day for 5 months; 3) Diet - 2 milks orally 3 times a day for 5 months; 4) CBC, CMP, PSA; 5) Robaxin 750 mg; 6) Figure 8-clavicle harness; 7) 2 mattresses for 1 year 10/23/08 through 10/23/09; 8) Demerol 50 mg intramuscular shot now; 9) analgesic balm; 10) waist chain permit for 1 year through 10/23/09; 11) note previous orders; 12) follow up in 2 weeks in M.D. sick call re possible prostate problem - no charge. (Def.'s Exh. A and Def.'s Exh. A-21, pp. 1-2.)

---

[4]Plaintiff denies the veracity of this fact, but does not provide supporting documentation.

43.     On October 23, 2008, Mr. Sanders was seen by Dr. Mahone for an urgent care visit.  He reported having a right shoulder dislocation which the healthcare staff reduced under sedation.  (Def.'s Exh. A.)

44.     Dr. Mahone also modified Mr. Sanders' pain medications from Ultram to ibuprofen at Mr. Sanders' request.  (Def.'s Exh. A.)

45.     Dr. Mahone renewed Mr. Sanders' permits and provided him with some additional ones as well.  She updated his medications and modified his diet as well.  (Def.'s Exh. A.)

46.     At that time, Mr. Sanders' shoulder reduced successfully and Dr. Mahone advised him to return for follow-up regarding a possible prostate problem.  (Def.'s Exh. A.)

47.     Mr. Sanders has been treated relating to his shoulder problem each time that he was seen by Dr. Mahone.  (Def.'s Exh. A.)

48.     Based upon Dr. Mahone's review of written documentation from the orthopedic physician at the University of Illinois at Chicago, Mr. Sanders does not need surgery to address his shoulder issue.  (Def.'s Exh. A.)

49.     Mr. Sanders' problem is chronic, and there does not appear to be a cure which would prevent his shoulder from dislocating, unfortunately.[5]  (Def.'s Exh. A.)

50.     Mr. Sanders has been ordered low bunk permits, special cuffing permits, extra pillows, and an extra mattress to provide comfort to him due to his medical condition.  (Def.'s Exh. A.)

51.     Dr. Mahone's decision not to refer Mr. Sanders out for another orthopedic evaluation is based upon her medical judgment, her experience, and her education, as well as her evaluation of Mr. Sanders, in conjunction with her review and consultation with prior orthopedic consultants concerning Mr. Sanders.  Dr. Mahone's decision not to refer Mr. Sanders out for another orthopedic evaluation is based upon her own medical judgment and not due to any policy, custom, or practice of Wexford Health Sources, Inc.  (Def.'s Exh. A.)

52.     In fact, Dr. Mahone's recommendation that Mr. Sanders be sent to an outside orthopedic surgeon for evaluation during her first week as the Medical Director was met with no resistance by Wexford and her superiors.  (Def.'s Exh. A.)

---

[5] In response to this fact, plaintiff points out that Dr. Sinha recommended a posterior bone block in March of 2005, but plaintiff has no evidence that a posterior bone block would have been successful.  According to Dr. Sinha, "It [plaintiff's right shoulder] might stay [in place] or it might not stay." (Def.'s Grp. Exh. A-3)

53. In reviewing Mr. Sanders' medical records, it appears that he has been seen at many outside facilities for varying complaints, including those related to his dislocated shoulder. In addition to the record from the University of Illinois at Chicago, Dr. Robert Prentice of Monmouth, Illinois has also given an opinion that a fusion was not a recommended option for Mr. Sanders' shoulder dislocation. (Def.'s Exh. A and Def.'s Exh. A-22.)

54. It should also be noted that most of Mr. Sanders' visits to outside physicians occurred prior to the time that Dr. Mahone began serving as the Medical Director at the Pontiac Correctional Center. (Def.'s Exh. A.)

55. Dr. Mahone has not told anyone at the Pontiac Correctional Center not to treat Mr. Sanders. (Def.'s Exh. A.)[6]

56. Mr. Sanders' lawsuit relates to care and treatment of his shoulder and no other body part. (Pl.'s deposition, p. 4, ll. 7-15.)

57. Mr. Sanders is specifically referencing his right shoulder. (Pl.'s deposition, p. 4, ll. 16-17.)

58. At the time of Mr. Sanders' deposition, he claims that his complaints with respect to Dr. Mahone, for example, relate to his shoulder being dislocated since August 26. (Pl.'s deposition, pp. 5-6.)

59. Mr. Sanders claims he wants Dr. Mahone to fix his shoulder so it does not pop out anymore. (Pl.'s deposition, p. 6, ll. 22-24.)

60. Mr. Sanders had the mistaken belief that the physicians at University of Illinois at Chicago recommended some other course of care. (Pl.'s deposition, p. 7.)

61. Mr. Sanders incorrectly believed that Dr. Goldberg suggested he needed a fusion of
his shoulder. (Pl.'s deposition, p. 10, ll. 13-23.)

62. Mr. Sanders admits that he had a discussion with Dr. Goldberg regarding fusion of his shoulder and that it would be unlikely to help him. (Pl.'s deposition, p. 11, ll. 2-9.)

63. Mr. Sanders admits that he is not aware of any doctors who recommend something different from the physicians at University of Illinois at Chicago. (Pl.'s deposition, p. 11, ll. 9-20.)

---

[6]Plaintiff disputes, but does not support with an affidavit.

64. Plaintiff suggests that his complaint at the present time relates to reducing his shoulder when it comes out of the socket. (Pl.'s deposition, p. 13, ll. 1-13.)

65. Plaintiff suggests that rolling over in his sleep can pop his arm out of the socket. (Pl.'s deposition, p. 13, ll. 19-21.)

66. Plaintiff admits that even after his shoulder is reduced, it can come right back out. (Pl.'s deposition, p. 13, ll. 22-25.)

67. He admits that this can occur within minutes. (Pl.'s deposition, p. 14, ll. 1-2.)

68. Plaintiff has been sent out to several hospitals at various times while incarcerated in an effort to reduce his shoulder. (Pl.'s deposition, p. 14, ll. 3-10.)

69. However, on at least one occasion, Mr. Sanders' arm dislocated before he left the hospital after having it reduced. (Pl.'s deposition, p. 14, ll. 11-17.)

70. Even after the shoulder became dislocated while in the hospital, the hospital sent Mr. Sanders back to the correctional facility without trying to do surgery again. (Pl.'s deposition, p. 14, ll. 18-25; p. 15, ll. 1-7.)

71. Mr. Sanders agrees that when his shoulder is in the socket, most any activity can cause it to come out of the socket. (Pl.'s deposition, p. 20, ll. 11-14.)

72. Even when Mr. Sanders' shoulder is out of socket, he is able to dress himself and feed himself. (Pl.'s deposition, p. 21, ll. 5-12.)

73. Mr. Sanders' claims against Wexford are based upon his claims against Dr. Mahone. (Pl.'s deposition, p. 40, ll. 19-25.)[7]

74. Mr. Sanders only put Wexford in the lawsuit because that's who Dr. Mahone works for. (Pl.'s deposition, p. 41, ll. 2-5.)


The Following is a disputed material fact:

1. Mr. Sanders' dislocating shoulder is not a medical condition that is likely to place Mr. Sanders at risk of substantial harm. The dislocated shoulder may cause Mr. Sanders some pain and discomfort, but is not of the sort of problem that would cause other medical problems. (Def.'s Grp. Exh. A-3, Pl.'s Grp. Exh. B and Pl.'s Grp. Exh. C.)

---

[7]Plaintiff disputes facts numbered 72- 74, but does not support with an affidavit.

DISCUSSION AND CONCLUSION

I.      **Plaintiff's Chronic Shoulder Dysfunction Constitutes a Serious Medical Need.**

This circuit held in *Gutierrez* that in order to prove a civil rights violation under the Eighth Amendment pertaining to the care and treatment of a medical condition, plaintiff must establish indifference to a serious medical need. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). Plaintiff must satisfy two prongs in order to prove indifference to a serious medical need. Plaintiff must first prove that he suffers from a serious medical need. A medical need is considered serious if it is "one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention, and if untreated could result in significant injury or unnecessary pain, and that significantly affects the person's daily activities or features chronic and substantial pain." *Id.* at 1373.

The record reflects that plaintiff has been seen by various medical personnel over the years regarding his shoulder and has received at least four surgeries on his right shoulder to address his right shoulder injuries. Over the years Plaintiff has received varying recommendations regarding the course of treatment that is required to ameliorate plaintiff's pain and suffering regarding his shoulder. Furthermore, Dr. Mahone prescribed braces, pain relievers and muscle relaxants for the plaintiff in order to attend to his chronic shoulder dislocation. Dr. Mahone also issued plaintiff a lower bunk and alternate cuffing permit because of plaintiff's shoulder dysfunction. Therefore, the court finds that a shoulder dislocation causes great pain and is a serious medical need. (*See Higgins v. Correctional Med. Servs.*, 178 F.3d 508, 511 (7th Cir. 1999), (Stating that a dislocated shoulder is a serious medical need.)

**A. Plaintiff has not Provided Sufficient Evidence of Deliberate Indifference Against Dr. Mahone.**

The second condition that must be satisfied is evidence of deliberate indifference to a serious medical need. While the court finds that plaintiff's chronically dislocating right shoulder does constitute a serious medical need, plaintiff bears the burden of providing evidence of defendants' deliberate indifference to said serious medical need. Deliberate indifference exists when a prison official knows of an excessive risk or safety and consciously disregards it. *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). Deliberate indifference is more than mere negligence and approaches intentional wrongdoing. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Medical malpractice does not by itself amount to deliberate indifference. *Walker v. Peters*, 233 F.3d 494, 499. (7th Cir. 2000). In order to establish deliberate indifference, the plaintiff must show that the physician was both aware of the fact from which the inference could be drawn that a substantial risk of serious harm exists, and he must actually draw the inference. *Higgins at* 511 (7th Cir. 1999). The exercise by a medical doctor of his or her professional judgment does not constitute deliberate indifference. *Youngber v. Romeo*, 457 U.S. 307, 322-323 (1982). Decisions regarding the care and treatment of a patient, when made by a professional, is presumed valid; "liability may be imposed only when the decision by the professional is such a

substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id*. at 323. The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. It does not, however, mandate, that prisoners be provided with the best treatment available or the treatment of their choosing. *Anderson v. Romero*, 72 F.3d 518, 524 (7th Cir. 1995).

The record reflects that Dr. Mahone has seen plaintiff on numerous occasions regarding his dislocated shoulder. Furthermore, the record also reflects that Dr. Mahone has treated plaintiff for his condition each time that she has seen him. Defendants argue and the record shows that whenever Dr. Mahone was involved in the treatment of plaintiff's shoulder she evaluated plaintiff's condition and treated it appropriately with varying modalities, including providing plaintiff with a shoulder brace, low bunk and alternate cuffing permits, as well as medical treatment for the medical issues he presented. Here, plaintiff argues that Dr. Mahone was obligated to follow the March 2005 recommendations of Dr. Sinha who suggested that <u>perhaps</u> posterior bone blocking or fusion would be beneficial to plaintiff's condition. Dr. Sinha's recommendation was issued prior to defendant Mahone's employment at the Pontiac Correctional Center and Dr. Mahone had no available evidence to suggest that Dr. Sinha's prior recommendation from 2005 would be applicable to the plaintiff at the time she became involved in his healthcare. Moreover, upon Dr. Mahone's employment at the Pontiac Correctional Center, she immediately scheduled an appointment at the University of Illinois at Chicago medical facility to have plaintiff's shoulder evaluated by an orthopedic specialist. According to the plaintiff's medical records, Dr. Mahone consulted with Dr. Funk to have a follow- up visit to the University of Illinois at Chicago Medical Center approved on July 27, 2008. The appointment was approved and the plaintiff saw Dr. Goldberg, an orthopedic specialist at the UIC Medical Center on August 28, 2008. The record reflects that Dr. Goldberg discussed his medical opinion regarding plaintiff's chronically dislocation shoulder and informed patient that he did not advise any further treatment due to what he felt was the voluntary nature of plaintiff's shoulder dislocations. The court finds that defendants have provided sufficient evidence to indicate that Dr. Mahone exercised proper care in her treatment of plaintiff regarding his serious medical need, specifically plaintiff's chronically dislocating right shoulder.

The court gives deference to the opinions of qualified medical personnel, so long as that opinion is not a rapid departure from the field. In this case, Dr. Mahone acknowledges that she based at least part of plaintiff's treatment of his chronically dislocating right shoulder on the recommendations of Dr. Goldberg, an orthopedic specialist at the University of Illinois at Chicago medical center. Dr. Goldberg, a qualified orthopedic specialist, indicated to Dr. Mahone that no further follow-ups were required to treat plaintiff's chronically dislocating right shoulder due to what he felt was the voluntary nature of plaintiff's dislocation shoulder. The practice of referring patients to specialists and taking the specialist's recommendations regarding the future treatment of the plaintiff into consideration is a commonly accepted practice in the medical profession. The court finds that Dr. Mahone was not indifferent to the plaintiff's medical needs, rather she was very attentive.

**B. Plaintiff Has No Evidence of Deliberate Indifference Against Wexford Health Sources, Inc.**

Plaintiff implicitly asserts Wexford Health Sources, Inc. has an established custom, policy or practice that constitutes deliberate indifference. The 7th circuit *Baxter* opinion holds that a corporate defendant may violate the constitutional rights of another as a result of its policies by having an express policy, that causes constitutional deprivation, upon its enforcement; by having a widespread practice that is considered permanent or so well- established that it constitutes a custom or usage with the force of law; or it a person or persons of final policy making authority caused the violation of constitutional rights to the injured party. *Baxter v. Vigo County School Corp.*, 26 F.3d 728 (7th Cir. 1994). In this instant case, plaintiff fails to indicate which of Wexford's customs, policies of practices are constituting deliberate indifference and fails to provide any evidence that supports his implicit assertion. Furthermore, in this case, there is no deliberate indifference. Accordingly plaintiff is not entitled to bring action against Wexford for vicarious liability on the part of Dr. Mahone, who is an employee of Wexford.. There is no standing for *respondeat superior* claims in section 1983 actions. *Iskander v. Village of Forest Park,* 690 F.2d 126, 128 (7th Cir. 1982). Plaintiff Sanders has failed to provide evidence that would convince a trier of fact to accept his version of the facts. The court, therefore, finds defendants, Wexford Health Sources Corp. and Dr. Mahone, are entitled to summary judgment.

It is therefore ordered:

1.   Pursuant to Fed. R. Civ. P. 56(c) the Defendants' motion for summary judgement is granted.

Enter this 25th day of September 2009.


**s\Harld A. Baker**
_____
Harold A. Baker
United States District Judge